IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 1, 2024

**IN RE TREYLYNN T., ET AL.**

**Appeal from the Chancery Court for Madison County**
**No. 80617      Steven W. Maroney, Chancellor**

_____

**No. W2023-00752-COA-R3-PT**
_____

This appeal concerns the termination of a mother's parental rights. Amanda L. W. ("Foster Mother") and Brian L. W. ("Foster Father") ("Foster Parents," collectively) filed a petition in the Chancery Court for Madison County ("the Trial Court") seeking to terminate the parental rights of Angel T. ("Mother") and Fortrell C. ("Father") to their minor children Treylynn T. and Amelia C. ("the Children," collectively).[1] The Tennessee Department of Children's Services ("DCS"), the Children's legal custodian, supported the petition. This matter arose after Amelia received a suspicious head injury while in Father's care. Mother never accepted that Father was responsible despite Father's ensuing *nolo contendere* plea to attempted aggravated child abuse. After a hearing, the Trial Court terminated Mother's parental rights on three grounds. The Trial Court found further that termination of Mother's parental rights is in the Children's best interest. Mother appeals, arguing only that the Trial Court erred in its best interest determination. We find, as did the Trial Court, that the grounds of substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody were proven against Mother by clear and convincing evidence. We further find by clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Angel T.

_____

[1] Father's parental rights were also terminated, but he did not appeal. Only Mother's parental rights are at issue. We refer to Father as necessary in discussing Mother's appeal.

Lanis L. Karnes, Jackson, Tennessee, for the appellees, Amanda L. W. and Brian L. W.

Jonathan Skrmetti, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

John Andrew "Andy" Anderson, Lexington, Tennessee, Guardian Ad Litem for Treylynn T. and Amelia C.

## OPINION

## Background

Mother and Father are the Children's parents. Treylynn was born in August 2014, and Amelia in September 2017. This case has its roots in a November 2017 incident in which Amelia suffered a subdural hematoma in her brain. At the time of the incident, Father was alone with Amelia and Mother was at work. Father called 911, and Amelia was taken to Vanderbilt University Medical Center. Fortunately, Amelia received medical care and survived.

Neither Mother nor Father could explain exactly what happened to Amelia. Mother mentioned that Amelia had slid off of her two days before the incident, but this had not resulted in a head injury. Given the lack of explanation, concerns arose that Amelia had been abused. Subsequently, Mother and Father were arrested for child abuse, and the juvenile court placed the Children in state custody. Mother eventually entered a best interest plea to child endangerment. She successfully completed diversion, and her record was expunged. Father on the other hand pled *nolo contendere* to attempted aggravated child abuse and received a ten-year sentence.

In December 2017, the Children were placed with Foster Parents. Six permanency plans were created over the course of the case. Mother's responsibilities under the initial plan, which formed the core for succeeding plans, included: complete mental health, parenting, and alcohol and drug assessments; provide proof of employment applications and income; resolve criminal charges and refrain from incurring new charges; visit the Children twice per month; and maintain safe and suitable housing. Per a follow-up plan, Mother was to participate in counseling.

With respect to the Children's adjudication, the juvenile court found that Amelia was a victim of severe child abuse. Mother appealed to the circuit court, which also found severe child abuse. Mother then appealed to this Court, which affirmed the circuit court. Finally, Mother sought an appeal to the Tennessee Supreme Court. By order, the Supreme

Court granted Mother's application for permission to appeal and reversed the finding that Mother had perpetrated severe child abuse. *In re Treylynn T.*, No. W2019-01585-SC-R11-JV (Tenn. Dec. 16, 2020). The High Court explained that the basis for the lower court's finding of severe child abuse—that Mother knowingly failed to protect Amelia from aggravated child abuse by Father—was incorrect as Father pled guilty to attempted aggravated child abuse, which was not one of the offenses under the definition of severe child abuse at Tenn. Code Ann. § 37-1-102(b)(27)(C). *Id*. The Supreme Court remanded to the circuit court for a new adjudicatory hearing. *Id*.

On August 2, 2021, Foster Parents filed a petition in the Trial Court seeking to terminate Mother's parental rights to the Children and to adopt the Children. Foster Parents alleged against Mother the grounds of abandonment by failure to visit, abandonment by failure to support, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. Foster Parents alleged further that termination of Mother's parental rights is in the Children's best interest.

This case was heard over the course of five days in September and November of 2022. Among the witnesses to testify was Amber Gutierrez ("Gutierrez"), former DCS family service worker on the Children's case. Gutierrez said that Mother never acknowledged that Amelia's injury was caused by physical abuse. According to Gutierrez, Mother was not always honest with her. For instance, at one point, Mother told Gutierrez that she did not know Father's whereabouts, but it turned out Mother had been harboring him from arrest. Mother also told Gutierrez that she was not pregnant with another child by Father, when in fact Mother had another child with him.

Dr. Mindy Kronenberg ("Kronenberg"), a psychologist, testified as well. Mother was tasked with seeing Kronenberg but the sessions eventually were discontinued. Kronenberg said that there was progress in Mother and Amelia's relationship. However, there was no progress in terms of Mother recognizing that Amelia had been abused. Mother did not find the sessions useful. Kronenberg testified: "I would have continued therapy; however, there was increasing problems with transportation, and I believe [Mother] told somebody else at some point that it did not -- she did not feel it was helpful or -- and, again, the drive was significant." On cross-examination, Kronenberg was asked if it would affect her opinion if it turned out DCS was wrong about its allegation of abuse. Kronenberg said that it would, as she would want to find out what had caused the child to enter custody. Kronenberg acknowledged that Mother completed parenting classes; attended many visits; and continued to fight for the Children.

Deborah Leggett ("Leggett"), a nurse practitioner, testified also. Leggett takes care of the Foster Parents' family. Foster Parents have five other children besides the Children.

Leggett stated that the Children, particularly Treylynn, were dealing with trauma. According to Leggett, Foster Parents are attentive to the Children's health needs, and Treylynn is doing better while on medication.

Annie Searock ("Searock"), executive director of CASA (Court Appointed Special Advocate) in Henderson County, took the stand. Searock observed over fifty visits between Mother and the Children before the visits were suspended. Searock said that, much of the time, Mother did not interact with the Children. Nevertheless, Searock acknowledged that Mother regularly attended visits and many times brought food, toys, and clothing.

Gutierrez returned to the stand. Gutierrez said that Mother had shown her some paystubs as proof of employment, but did not do so regularly. Asked if a parent providing proof of employment is more important to DCS than the parent actually being employed, Gutierrez said that the documentation is how DCS knows the parent is employed. Gutierrez was then pressed on why Mother should acknowledge that Amelia was abused if the abuse happened when Mother was at work and not there to see it.

Jessica Harrison ("Harrison"), a therapist with Camelot who worked on the Children's case, testified. Harrison supervised visits between Mother and the Children through early 2019. Harrison said that Mother was sometimes engaging, but withdrew at other times. Asked what skills she observed from Mother, Harrison said: "[I]t appeared that there was still struggles. Like, as far as the relationship with Amelia, it did improve where she wasn't, you know, inconsolable the entire visit and things of that nature, but it still appeared to be a lot for mom." On cross-examination, Harrison acknowledged that there were good visits and moments of joy, too.

Michele Stephens ("Stephens") with Child Protective Services testified also. Stephens worked on the initial investigation into Amelia's injury. Stephens discussed Amelia's injuries, stating that "the child was two months old and had a subdural hematoma and two bilateral hematomas -- two bilateral brain bleeds and a subdural hematoma. Those were of varying healing stages." Asked whether this raised concerns for abuse, Stephens agreed that "in three places, the Vanderbilt doctors indicated a concern for child abuse." On cross-examination, Stephens explained why Vanderbilt released the Children back to Mother despite the severity of the injuries to Amelia, stating: "Vanderbilt determined that the child was stable enough to leave and would have to be seen immediately by their pediatrician. In the meantime, Vanderbilt was aware that the family was going to come and meet with us." The doctors were concerned that the injuries were suspicious for non-accidental trauma. Stephens said that one Dr. Lisa Piercey was "very concerned." Asked if she was familiar with deposition testimony in which Dr. Piercey stated that she could not conclude beyond a reasonable degree of medical certainty that Amelia's injury was caused

by abuse, Stephens could not recall. Stephens said that she based her information on what Dr. Piercey told her directly.

Brianna Hendrix ("Hendrix"), a DCS family service worker, took the stand also. Hendrix had worked on the Children's case since February 2022. Hendrix stated that she had not had any problems with Mother that year. Hendrix stated further that Mother had a job, had a home, and was current on child support. On cross-examination, Hendrix acknowledged that she had only observed six months of a nearly five-year custodial episode.

Treylynn's therapist, Alvin Bonds ("Bonds"), testified among other things that, early on, "Treylynn would come to a session and express concern because his mother would ask questions or say things that he knew she shouldn't have been saying, whether it's because they talked about it previously, and he just expressed distress because of that." Bonds suggested to DCS that the visits stop. Bonds stated: "Shortly after the visitations stopped, there was some distress because some of the feelings that Treylynn has is that he loves his -- his biological mother and he loves his foster family and felt like he was kind of being torn and forced to choose between them." Asked about Treylynn's behavior now, Bonds stated: "He's more regulated. The anxiety seems to be less. He's still having outbursts, and he still has, you know, anger, you know, issues that happen, but he doesn't seem as -- as wound up. He seems more regulated, I think is the best way to describe him."

Mother took the stand. Mother lived in a home owned by her stepfather, but she was "in the process [of] taking ownership of the home." Mother lived in the home with her daughter, a child not subject to these proceedings. Father had last lived with her three years earlier. She had seen a counselor for the past four years. Mother works as a safety and environmental coordinator earning around $25 per hour. Mother estimated that she had last communicated with Father in prison approximately a week before the hearing if not longer. Asked what she believed had happened to Amelia, Mother stated: "I don't believe that [Father] hurt my daughter. I know that she has the brain injury, but I think we should have put more effort into finding out what was actually wrong with her instead of being thrown into a court system." Mother had another child with Father before he returned to jail.

At this juncture of the hearing, Foster Parents testified. Foster Parents are both pastors. Foster Mother testified, among other things, about the progress Treylynn had made, stating: "He has become so much more emotionally intelligent to understand his own feelings, to discuss his feelings. He still struggles a lot with fear and-anxiety. He is very attached and integrated into our family." In addition, Mother's mother took the stand, testifying that Mother is a wonderful parent.

-5-

Mother testified further.  Mother described what happened from her perspective on the day of the incident with Amelia:

> I received the phone call.  I went -- I dropped the phone.  I didn't hang it up.  I shot straight to the house.  By the time I got there, the ambulance and the police were already there.  I would say there was about seven police cars, from cars to SUVs, and the ambulance.  I knew a bunch of the officers. I knew the people who was working the EMT.  I had spoke to them.  When I first hit the driveway -- it's a long driveway.  When I first hit it, I could hear Amelia crying, and that was a relief to me.  Any sound I could hear was a relief to me.  I get there.  The ambulance is at the end.  I look in there and I see Amelia.  I go into the ambulance with Amelia.  I'm rubbing her hand.  I'm asking, "What's going on?  What's happened?"  She looks normal.  I -- I didn't know -- I didn't care about nothing but her at that time.

Mother said that Amelia had a reddish purple mark, or "strawberry," on the front of her head, which she had had since birth.  Otherwise, Mother saw no scratches or bruises.  Mother stated that, notwithstanding her plea to child endangerment, she had nothing to do with Amelia's injury.  Mother testified further that she had never seen Father abuse the Children.  Regardless of her continued feelings towards him, Mother said that she would not take the Children around Father if custody were restored to her.  On cross-examination, Mother was asked why she remained unpersuaded that Amelia had been abused:

> Q. But, still, based on those assessments that raised questions and concerns about abuse, you don't believe those -- are those not enough to convince you?
> A. So as -- with Dr. Piercey in her -- in her paperwork she states that she cannot conclude that it's child abuse.
> Q. Well, let me -- let me --
> A. It was hard for me to -- if you -- if you abuse a child, you're going to have a mark -- that child is going to have a mark.  If that -- if you was to hurt a child, they're going to have a -- a mark.  If you hurt a child hard enough -- if you was to go and hit a child, they're going to have a mark on them.  There's going to be something showing that some kind of pressure, indention, anything has hurt that child.  You're going to be able to tell from the outside that something has happened.
> I examined her from head to toe.  I asked doctors.  When I was in Vanderbilt, I just didn't sit there and freak out.  I was at the nurse's desk bothering them, and I -- I felt like her head was swollen.  I -- I didn't know at the time.  I wanted them to look at her.  Her head wasn't swollen, but I just -- I was scared.  So I had asked them to look at her head.  Look -- and I thought the strawberry had something to do with it.  I didn't know no

different. I -- I freaked out. I asked for their opinion and their help, and nobody had said anything about child abuse to me at Vanderbilt.

Q. But at -- but at that time and even based on looking at all these documents, the -- sorry. The -- the lack of some visible physical injury to you has also caused you questions?

A. Yes.

Q. But even though the doctors and assessors have arrived at conclusions that there were suspicions, it's still not been enough to convince you?

A. I believe that some of them had an opinion from the outside looking in, and that wasn't enough for me to say that the father had abused them.

Q. But, also, the juvenile court has found that [Father] committed severe child abuse, correct? And he did not appeal that to circuit court, did he?

A. I don't -- I don't know.

Q. He did not participate in our hearing before Judge Allen, did he?

A. No, sir.

Q. He did not respond to the petition in this case regarding his parental rights and the allegations of abuse?

A. Not that I'm aware of. I don't know.

Q. He pled -- he made a plea of some sort that entered in a guilty verdict against him in his criminal case?

A. Yes.

Q. Yet all of that has not been enough to persuade you that he would have caused these injuries?

A. It's not been enough to persuade me that he caused the injury, but it's been enough to make sure that I don't let him around the children if they come home.

After the hearing, the Trial Court found that the grounds of substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody were proven against Mother by clear and convincing evidence. The Trial Court did not find clear and convincing evidence for the grounds of abandonment by failure to support or failure to visit. The Trial Court found by clear and convincing evidence that termination of Mother's parental rights is in the Children's best interest. In January 2024, the Trial Court entered its amended final judgment, stating as relevant:

45. Mother regularly continued her relationship with Father subsequent to the removal of the Children, even after his incarceration. As Mother's counsel points out, there is no evidence of a no contact order between Mother and Father. Mother has often put money in Father's jail account.

46. Mother and Father were not honest and forthright with the initial DCS Family Service Worker, Amber Gutierrez, during the latter's oversight of the case in that mother was harboring Father while [there] was an outstanding warrant for his arrest, while at the same time Mother was telling Ms. Gutierrez she did not know Father's whereabouts.

47. During this time, Mother also conceived (and subsequently birthed) an additional child with Father. Ms. Gutierrez had been told that Mother was on a trip when in fact she was giving birth to Father's new child.

48. Ms. Gutierrez testified that Mother had a pattern of not being truthful with her. In her testimony, Mother acknowledged not being truthful with DCS about her new pregnancy and birth.

49. While Father was incarcerated in Henderson County, the parties had voluminous phone, email, and video communication. These Certified "Chirp" Files from the Henderson County Jail consisted of texts, emails, and approximately 880 videos between Mother and Father which have been provided to the court. Many of these were played during the hearings of this cause.

50. The jail video calls played during the proceedings demonstrated troubling comments and other inconsistencies in Mother's statements to others following the removal. For example, one video displayed Mother telling Father not to let anyone know he had been living with her when in fact he had been doing so.

51. The videos also recorded Mother stating she was going to be creating some receipts for housing expenses to take to an upcoming meeting with Ms. Gutierrez (to satisfy DCS requirements for receipts from third parties).

52. One video recorded Mother saying she would lie to her employer about Grandmother's health.

53. One video recorded Mother laughing about falsifying a physician's excuse so she could go somewhere with her family.

54. Another recorded Mother saying she was "high" while at work (a condition she denied being in at work during her courtroom testimony).

55. Mother also denied (in her testimony) that she had ever left her newest child (an infant) unattended in a vehicle; yet, recorded jail video showed her leaving the infant alone in a car while she went into a store.

56. Mother became emotional in the courtroom while many of these videos were played. She testified that she had stated things in the videos which were not true. This admission casts further doubt upon her credibility as a witness.

57. As detailed above, in a video call recorded October 3, 2020, Mother told Father "I know that I dropped the baby" and said that she told a detective that while the ambulance (which transported Amelia) was still in the driveway. Father repeatedly asked during this call, "Why am I in jail", indicating failure

to acknowledge (and thus remedy) the conditions which led to the children's endangerment.

\*\*\*

[substantial noncompliance with the permanency plan]

A Family Permanency Plan was adopted following a meeting on December 20, 2017, with a goal of the return of the children to Mother and Father. The Plan detailed multiple action steps for both parents to take as steps toward realization of the ultimate goal of return. These included:

1. Attendance of parenting classes (these were attended by Mother only, and then sporadically)

2. Completion of psychological parenting assessment (completed by both Mother and Father initially. However, Mother and Father failed to complete the resulting psychological recommendations for individual counseling. These recommendations were listed as requirements in Mother's and Father's Statement of Responsibilities in the subsequent March 23, 2018, Family Permanency Plan.[)]

3. Applications for employment weekly and providing proof of same (Mother had been terminated from her job as a CNA due to the criminal charges filed against her arising out [of] Amelia's injuries and removal of the Children. Neither Mother nor Father provided the required proof, though Mother provided some proof of employment sporadically. In between jobs, however, she did not provide the required proof of applications . . . .)

4. Resolution of pending criminal charges against Mother and Father (not accomplished until 2019).

\*\*\*

Mother failed to fully accomplish the requirements in her Statement of Responsibilities except for resolution of her criminal charges. Mother did not comply in providing documentation of all employment, and all rental leases. She partially complied with the requirements of attending parenting classes and providing proof of employment and job applications.

However, Mother utterly failed to successfully follow through with the requirement of individual counseling as made in the March 23, 2018, Family Permanency Plan Statement of Responsibilities. Mother disagreed with recommendations made by Dr. Kronenberg calling for Mother to participate in bonding activities. Mother testified she "didn't see the point in it." She also cited living two hours from Dr. Kronenberg as a reason for not

-9-

participating. Mother failed to cooperate with Dr. Kronenberg, leading to the latter's discontinuance of the sessions.

Given the gravity of the incident leading to removal, Mother's refusal to cooperate in counseling that directly addressed Mother's denials concerning that incident, and Mother's continued problems with visitations affecting the children which might have been mitigated or eliminated with successful counseling, the Court finds by clear and convincing evidence that there has been substantial non-compliance with Mother's statement of responsibilities in her Permanency Plans, and therefore this ground for termination as to the Children is established.

***

[persistent conditions]

The Children were removed from Mother and Father on November 28, 2017. By September 6, 2022, the Children had been removed from Mother and Father for more than six months . . . .

As for Mother, the Court finds that Mother's refusal to recognize Father's role in Amelia's injuries and her persistence in maintaining a relationship with Father, to the point of conceiving another child with him, lead the Court to conclude that the conditions that led to the Children's removal still persist as to Mother, creating a reasonable probability that this would cause the Children to be subjected to further abuse or neglect in Mother's care. The Court finds little likelihood that these conditions will be remedied at an early date so that the Children can be safely returned to the parent or guardian in the near future, given Mother's failure to recognize Father's role in the injuries and her insistence on maintaining Father in her life (and by extension, the Children's, should she reestablish a custodial relationship with them). Mother has failed to establish stability in her housing, based upon her erratic housing history. Mother has also acted improperly in her supervised visits with the Children such that they had to be discontinued for the wellbeing of the Children, particularly Treylynn. This causes the court to conclude that the continuation of the parent and child relationship with Mother greatly diminishes the Children's chances of early integration into a safe, stable, and permanent home.

There is further nothing in the record to suggest Mother has or will remedy the conditions of wanton disregard for the Children which led to their removal. Therefore, the Court finds this ground of termination is established by clear and convincing evidence as to Mother.

-10-

\*\*\*

[failure to manifest an ability and willingness to assume custody]

As for Mother, she has shown a willingness to assume legal and physical custody of the Children. She has fought aggressively to have her criminal charges resolved in a manner which would allow her to seek resumed custody. She has paid child support, and she has attended visitation with the children, with some admitted missed or shortened visits.

However, she has failed to manifest <u>both</u> an ability and a willingness to assume legal and physical custody of the Children. She has failed to fully comply with the recommendation of Dr. Kronenberg. She has never progressed in her visitation to a point where unsupervised visitation was an option. Further, placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children, as Mother has persisted both in her denial of Father's risk to the physical welfare of the Children and in her continuance of a close relationship with Father. Having the children in Mother's legal custody would expose them to risk of harm from father, should that relationship continue when his incarceration ends, or from any others whose risks to the Children Mother may be willing to overlook.

The Court therefore finds that by clear and convincing evidence, it has been established that Mother has failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the Children and placing the Children in Mother's legal and physical custody would pose a risk of substantial [harm] to the physical or psychological welfare of the Children.

\*\*\*

[best interest]

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority: Termination would aid the Children's need for stability and continuity of placement as they would be able to continue in the only home and in the only family since they have known since their placement with Petitioners in December 2017. The improved behaviors and stability manifested by the Children, particularly Treylynn since visitation ceased supports this conclusion.

-11-

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition: In contrast to the previous factor, the anxiety and troubling behaviors manifested by Treylynn when experiencing visitation with Mother and removed from petitioners demonstrates that changing his caretakers would negatively impact him emotionally, psychologically, and medically (to the extent further medication was necessary for him). Further, removing Amelia and returning her to the care of Mother and Father, in whose prior care she sustained serious injuries demonstrates that a change of caretakers now would likely put her at risk emotionally, psychologically, and medically.

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs: . . . Mother is employed but her employment and housing history have been very sporadic. She has changed jobs and housing multiple times and has been inconsistent in her explanations of these when called to give an account of them.

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment: . . . The Children have a relatively greater attachment with Mother, but the attachment has not been characterized as healthy and secure as evidenced by the improved behavior and stability the children, particularly Treylynn, when visitation with Mother ceased.

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child: . . . Mother did maintain visitation prior to its cessation, but the visitation did not cultivate a positive relationship. Mother was detached during many visits; she improperly tried to reintroduce communications between Father and the Children, and the visitations resulted in negative behaviors by Treylynn afterwards.

(F) Whether the child is fearful of living in the parent's home: The Court did not receive any evidence as to this factor and finds it inapplicable.

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms: Mother's presence exacerbates negative emotional responses, as already detailed, but not necessarily post-traumatic symptoms. The Court finds this factor as specifically stated inapplicable as to both Mother and Father.

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent: The Children have established very healthy parental attachments with Petitioners. The Children call them Mom and Dad. The Children and Petitioners engage in activities

together as set forth above, such as reading, attending church, and travel. The Children are secure with Petitioners and look to Petitioners for emotional support.

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage: The Children have also bonded with the children of Petitioners, treating them as siblings and playing outdoors with them. The Children and Petitioners' immediate family enjoy typical positive family interactions, attend church together, and go on vacations together. Petitioners' extended family also has positive interactions with the Children.

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner: . . . Mother has created a home, but she has been unable to sufficiently adjust so as to even have a single unsupervised or overnight visit. Mother fails to sufficiently make this factor's described demonstration.

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions: Neither parent successfully followed through with the counseling recommendations made in their second Family Permanency Plan. Mother testified that she felt Dr. Kronenberg was against her. Mother disagreed with recommendations made by Dr. Kronenberg calling for Mother to participate in bonding activities. Mother testified she "didn't see the point in it." She also cited living two hours from Dr. Kronenberg as a reason for not participating. Mother failed to cooperate with Dr. Kronenberg, leading to the latter's discontinuance of the sessions.

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department: The department proposed counseling and formed a series of Family Permanency Plan[s] with an initial goal of returning the Children to Mother and Father, but these reasonable efforts were unsuccessful due to the lack of cooperation by Mother and Father.

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest: . . . Mother has demonstrated some

urgency in attempting to regain custody but has not shown urgency in addressing whether Father would be a part of the Children's lives, should her rights not be terminated.

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult: . . . This factor does not weigh against Mother presently, though the Court is concerned as to whether she would attempt a future reintroduction of Father into her household, should she have the Children in her custody and care.

(O) Whether the parent has ever provided safe and stable care for the child or any other child: . . . This factor weighs against Mother to some degree as well, due to the injuries sustained by Amelia during the time the Children resided with her.

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive: . . . Mother has demonstrated some understanding of these needs but has failed to show an ability to then put this understanding into adequate practice; for example, she has failed to cooperate with counseling designed to aid her in development of this understanding and its subsequent application.

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive: . . . Mother's post-removal housing has been erratic, as she has moved multiple times and she has not shown herself trustworthy of more than supervised visitation, at best.

(R) Whether the physical environment of the parent's home is healthy and safe for the child: . . . Mother does presently live in a home that appears to be a safe structure for the Children's habitation. However, Mother's home is shared with Grandmother and located on property where Grandmother periodically stays and cares for Stepfather's Mother, where Grandmother will eventually live. Grandmother was deemed by DCS to be unfit as a guardian for the Children due to failed drug testing.

(S) Whether the parent has consistently provided more than token financial support for the child: . . . Mother, despite her erratic employment history, has consistently paid child support.

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child: . . . Mother's counseling experiences with Dr. Kronenberg, despite their incomplete nature, suggest that she has not come to grips with the dangers to which the Children have been exposed while living with Mother and Father

and cast some doubt on her emotional fitness to the extent that fitness would prevent Mother from providing sage and stable care and supervision of the Children.

Considering all of these factors in total, and the record as a whole, the Court finds by clear and convincing evidence that termination of the parental rights of Father and Mother is in the best interest of [the Children].

Mother timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Mother raises one issue on appeal: whether the Trial Court erred in finding that termination of Mother's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the
best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the

_____

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Mother does not challenge any of the grounds found against her. Nevertheless, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, we will review each of the grounds found against Mother even though she does not dispute any of them.

On August 2, 2021, when Foster Parents filed their petition, the relevant grounds for termination read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

\*\*\*

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard; [and]

\*\*\*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2021 to June 30, 2022).

We first address whether the Trial Court erred in finding the ground of persistent conditions. The Children were removed from Mother's custody for the necessary six months, and a petition was filed in juvenile court alleging that the Children were dependent

-19-

and neglected. The basis for the Children's removal was the arrest of both parents on child abuse charges. While Mother successfully completed diversion and resolved her criminal matters, Father pled *nolo contendere* to attempted aggravated child abuse and received a ten-year sentence. Despite this, Mother has failed to acknowledge even the possibility that Amelia was abused by Father. Indeed, Mother maintained a relationship with Father and had another child with him.

At trial, Mother was questioned as to why she remained unpersuaded that Amelia was abused. Mother offered an illogical answer. Mother testified that an abused child has to "have a mark" on them somewhere. However, it takes no great leap of the imagination to think of scenarios in which a child is abused, yet no mark is visible. Mother was unable to offer any plausible explanation for what happened. She just flatly rejected that Father could have abused Amelia notwithstanding his guilty plea. Mother's rejection of the possibility that Amelia was abused by Father has persisted right through the case. It appears that Mother is committed to defending Father against abuse allegations no matter the evidence. In light of this loyalty to Father above all else, Mother's testimony that she would keep the Children away from Father rings hollow in view of the persistence of her relationship with him. It also casts doubt on Mother's willingness to protect the Children from further harm. It is no wonder that the Trial Court found Mother's testimony not credible in multiple respects. Beyond her denial that abuse occurred, Mother has not fostered a healthy relationship with the Children. For example, Treylynn's behavior improved after the visits ended.

Despite the passage of almost five years from removal to trial, conditions preventing the Children's safe return to Mother persist. These conditions would in all reasonable probability cause the Children to be subjected to further abuse or neglect. Given the lack of progress in key areas over the custodial episode, there is little likelihood that the conditions will be remedied at an early date so that the Children can be safely returned to Mother in the near future. While this case has unfolded, the Children have thrived in Foster Parents' home and are bonded with their foster family. They enjoy stability and their health needs are attended to. Given the Children's connection to their foster home and their need for permanency, the continuation of the parent and child relationship with Mother greatly diminishes the Children's chances of early integration into a safe, stable, and permanent home. The evidence does not preponderate against the Trial Court's findings relative to this ground. We find, as did the Trial Court, that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

The Trial Court also found the grounds of substantial noncompliance with the permanency plan and failure to manifest an ability and willingness to assume custody. The Trial Court found, among other things, that "Mother utterly failed to successfully follow through with the requirement of individual counseling as made in the March 23, 2018,

Family Permanency Plan Statement of Responsibilities." The Trial Court found further that Mother's noncompliance was substantial in view of the reasons for the Children's removal. The evidence does not preponderate against the Trial Court's findings relative to this ground. We find, as did the Trial Court, that the ground of substantial noncompliance with the permanency plan was proven against Mother by clear and convincing evidence.

With respect to failure to manifest an ability and willingness to assume custody, the Trial Court found that Mother manifested a willingness to assume custody of the Children but not an ability. Here, the Trial Court cited Mother's non-cooperation with counseling and lack of progress toward unsupervised visitation. Our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Regarding the second prong of the ground, the Trial Court found that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. As to this prong, the Trial Court cited Mother's denial of abuse and her continued relationship with Father. We find that the evidence does not preponderate against the Trial Court's findings with respect to either prong of this ground, and both prongs are proven by clear and convincing evidence.[5] We find, as did the Trial Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother by clear and convincing evidence.

The final issue we address is whether the Trial Court erred in finding that termination of Mother's parental rights is in the Children's best interest. On August 2, 2021, when Foster Parents filed their petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

---

[5] DCS argues that the evidence preponderates against the Trial Court's finding that Mother manifested a willingness to assume custody of the Children. The Trial Court found that "[Mother] has fought aggressively to have her criminal charges resolved in a manner which would allow her to seek resumed custody. She has paid child support, and she has attended visitation with the children, with some admitted missed or shortened visits." The evidence does not preponderate against these findings. Mother manifested a willingness to assume custody. However, we affirm the Trial Court's finding that Mother failed to manifest an ability to assume custody. Under *In re Neveah M.*, that is enough to establish the first prong of this ground.

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;
(O) Whether the parent has ever provided safe and stable care for the child or any other child;
(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;
(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;
(R) Whether the physical environment of the parent's home is healthy and safe for the child;
(S) Whether the parent has consistently provided more than token financial support for the child; and
(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.
(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.
(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.
(4) Expert testimony is not required to prove or disprove any factor by any party.
(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022).

In her brief, Mother argues that the Children were taken from her "based on nothing more than concerns and suspicions." She states that "[i]t cannot possibly be in the best interest of these children to terminate [Mother's] rights when the children were essentially kidnapped from her." Mother cites her own mother's testimony that she is a good parent. She also cites DCS worker Hendrix's positive testimony about her. In addition, Mother points to her completion of various tasks over the years, such as assessments, counseling, classes, and tests. She says that "[t]he trial court seemingly ignored all the progress [Mother] made throughout the last several years." Mother says that she has a safe home and has agreed to keep Father away from the Children in the future.

We disagree with Mother's contention that the Trial Court overlooked the good things she did. On the contrary, the Trial Court credited Mother in several areas. The Trial

Court found that Mother is employed; that Mother has a degree of attachment with the Children; that Mother maintained visitation before it ended; that Mother has created a home; that Mother has demonstrated some urgency in trying to regain custody of the Children; that Mother has demonstrated some understanding of the Children's needs; that Mother's home appears to be a safe structure for habitation; and that Mother has paid child support. Thus, the Trial Court considered Mother's positive actions.

However, the Trial Court ultimately concluded that the statutory factors in their totality favored termination. The Trial Court found that termination would help the Children achieve permanency in the only home they have known since December 2017; that the Children's behavior improved when Mother stopped visiting; that changing caregivers risked a return of Treylynn's troubling behaviors; that changing caretakers now would pose a risk to the Children; that Mother has a sporadic housing and employment history; that the Children's attachment to Mother is not of a healthy and safe kind; that Mother's visits did not cultivate a positive relationship with the Children; that the Children have a healthy attachment to Foster Parents; that the Children have bonded with their foster family; that Mother failed to progress to unsupervised visitation; that Mother failed to cooperate with Dr. Kronenberg; that Mother has shown no urgency in addressing whether Father would be part of the Children's lives should her rights not be terminated; that Mother's home is shared with her mother, who DCS has deemed unfit to be a guardian for the Children; and that Mother has not grappled with the dangers that the Children were exposed to in Mother and Father's home. The evidence does not preponderate against these findings.

That Mother did certain positive things over the course of this case is commendable, but not decisive. This Court has stated:

> [A]t this stage of review in a parental rights case, with grounds having been found for termination, the second question in the two-part process is whether termination of parental rights is in the child's best interest, not the parent's best interest. Decisions regarding the termination or preservation of parental rights are neither a punishment to be meted out nor an award to be rendered to a parent. Even if a parent has made a number of commendable changes to his or her lifestyle, this alone may not be sufficient to establish that it is in the child's best interest for the parent to retain his or her parental rights . . . .

*In re Kaedince M.*, No. E2015-00763-COA-R3-PT, 2015 WL 6122776, at *7 (Tenn. Ct. App. Oct. 19, 2015), *no appl. perm. appeal filed*.

The primary issue in this case, and the one that brought about the Children's removal in the first place, is child abuse. Mother has never acknowledged even the possibility that

Father abused Amelia despite his criminal plea. That fundamental rejection has been a major barrier to Mother's progress in this case. Along similar lines, Mother did not cooperate fully with counseling. Given the injuries suffered by Amelia in Mother's home, Mother was not in a position to pick and choose which forms of counseling she was willing to cooperate with if she was interested in regaining custody of the Children. Any prospect of reunification depended upon Mother remedying the conditions that led to Amelia's injury so that similar injuries would not be inflicted upon the Children going forward. Toward that end, it was incumbent upon Mother to cooperate fully with recommended services. She did not. In fact, Mother never squarely faced the issue of child abuse.

In the meantime, the Children have known one home since December 2017—that of Foster Parents. The Children have bonded with their foster family. It is in the Children's best interest to attain permanency rather than to wait indefinitely for Mother to be in a position to safely care for them. We find by clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Angel T., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-25-